Looks like we'll start with Ms. Bernstein. Thank you, Your Honor. May it please the Court, Whitney Bernstein on behalf of the former owners and operators of the publishing platform. Given the 15 minutes for argument, I'm going to sit down after 8 minutes and cede the rest of the time to my colleague. We intend to save 5 minutes for rebuttal. Before you start, let me make sure, okay, so I'm in trouble with my, when you say reserve 5 minutes, you can't use the whole, that's your full time on the clock. And so if you use the whole 8 minutes, you won't have any time for rebuttal. So how much time would you like for your rebuttal? Because your rebuttal time will be separate. Thank you. I'm going to burn through my 8 minutes and then I'm going to turn it over to my colleague who will do 2 minutes and we collectively intend to save 5 minutes for rebuttal. Okay, well we'll do that then. Thank you, Your Honor. This prosecution is based on the publication of 50 specific classified ads that the government alleges facilitated prostitution misdemeanors. The issue before you is the denial of our motion to dismiss under the Double Jeopardy Clause. And here timing matters and at the time the mistrial was declared, the government knew two things. One, the government knew that it could not deliver the case it had promised the jury because of the testimony of its lead law enforcement witness and the strictures of the First Amendment. And two, the government knew that the defense would move for a mistrial. If the government introduced inflammatory testimony about child sex trafficking. What's the standard by which we judge whether or not the government sufficiently induced the mistrial that Double Jeopardy prevents a retrial? What's the standard that you have to satisfy? Your Honor, the cases indicate that it is, that this court or any court evaluating the issue is to take an objective look at the record to evaluate the government's subjective intent in goading the mistrial. And that fact-finding mission is familiar to courts to analyze a record and from that make inferences about intent. So we've got to find that the government intended to produce a mistrial? Correct, Your Honor. And we do submit that the record before you is sufficient to make that inference. And if the district judge disagrees with you, how do we review the decision of the district judge as to whether the evidence justifies the conclusion you're seeking? Your Honor, I believe the standard for this court to apply would be clear error and in this case the district court's decision was clearly erroneous. The first thing that I want this court to consider in that regard is that the motion judge who denied the motion had the unenviable task of parachuting into this complex, lengthy case three and a half years into the prosecution mid-motion and is not the judge that presided over the trial or declared the mistrial. And in the Supreme Court case law and the cases of this court where deference is given to the district court judge, even as recently as this court's decision in the Michael Avenatti case, it is where the court recognizes that it's where the judge was the same judge for all of the proceedings that decided the motion. Do we know from the record why it was moved to the new judge to determine what the government's intent was? We don't, Your Honor. And I think the history does matter because to the extent the court finds ambiguity in the record, I think the history of judges turning over matters. We have no indication of why the trial judge recused. The trial judge presided over the case for roughly two and a half years. The motion judge who came in after we had already filed our motion and I believe before the government's reply was the fourth judge to this case. And there were over 1,400 docket entries by the time that judge took the action. And when the mistrial was declared, not very much had gone on. It was two days of testimony. Is that right? We were on, I believe, day eight of trial, and I'm not sure exactly how that broke down in terms of jury selection and openings. No, I'm asking about testimony. There had been four witnesses who had testified. I believe we were on the third day of trial, but there had only been four witnesses who had testified. And how long was the trial expected to last? The government had estimated that the trial would last approximately three months, and the government did represent that they had various other witnesses. But I think what's critical is not that this was so early in the case. It can still allow this court to find that the government had the intent to go even so early because the cumulative errors that the government had committed by that point in time, repeatedly violating the judge's orders. As I look at what the government did that produced the mistrial, was that it stepped over the line in questioning. But the line was pretty vague. A lot of the line was, we don't really want to get too much into this or too much into that. And then the government asked questions that produced answers that the court said, well, you know, that actually goes over the line and this is too much. It's hard. We've seen a lot of misbehavior over the years. I'm not at all questioning the district judge's conclusion that the government stepped over the line with the questioning, nor am I questioning the district judge's decision to grant a mistrial. But the government's behavior does not seem to me egregious. Can you help me with that? Yes, Your Honor. And to begin as a threshold matter, the standard is not egregious. It's whether it was intended to go. I understand that. The government's intention was not so bad as to that they're just trying to produce a mistrial. I mean, that's the argument, right? Yes, Your Honor. And a couple of points in response. Number one, the orders were clear, and the government never expressed any confusion or asked questions. The orders really weren't very clear. I think this was a difficult line to police. It may have been that the government stepped over it. But I can't say, having read the transcript, that things leapt out on the page to me that these were violations of the district court's order. Yes, Your Honor. I would direct you to, in the context of the pediatrician Cooper, I would direct you to 21-ER-4355. And that is where the district judge unequivocally directs the government to, quote, direct your witness to testify in accordance with the parameters that she placed on that witness. There's also at 21-ER-4314, 4354, and 22-ER-4602, the district judge discusses the scope of the expert testimony to confirm that the expert will not be testifying about child sex trafficking. The government, nonetheless, elicited questions and answers that were almost exclusively about children, which is what the district court found in granting the mistrial. Even during that witness, the trial judge stopped the proceedings and said to the government at 23-ER-4744 and 23-ER-4755 to, quote, excuse me, to, quote, move on, to be careful, because they're getting close to a four. Those sound like ordinary instructions. I've read a lot of trial transcripts, and that sounds a lot like what district judges say when they're sustaining an objection to something. You got the mistrial, so all of that evidence is going to be excluded, and presumably, if there's a retrial, the government will be more careful the next time. I don't know that that's a fair... But I'm still looking for the evidence of goading. Your Honor, I think just applying the common sense to the record before this court, I mean, when a judge repeatedly tells the government, do not do this, and the government does it, quote, over and over and over again, which is what she said at 23-ER-4815, and it's experienced, intelligent prosecution team, you can only assume that it was intentional. And then I think the question becomes, to what end? And if it wasn't to get a mistrial, then it was intentional to interject prejudice into the record to get a conviction. But pressing... Now, the government, when the motion for mistrial is made, the government opposes that motion pretty strenuously. Are you saying that the government was hoping that their... that the motion would be granted despite their strenuous objection? I don't believe there's strenuous objection in the record. There were three motions for a mistrial made because the government's conduct... Three motions for a mistrial made on the basis of the government interjecting inflammatory child sex trafficking into the record. And after the first motion was made, the government did file a written response. When the motion that was ultimately granted was made, there's no objection from the government. The court comes out, and that's at 23-ER-4814 and 15. The court comes out and delivers its mistrial motion and says, Any questions? The government doesn't try to dissuade her from that. The government doesn't ask for time to brief the issue. The government doesn't say, Judge, this is wrong because of the following. The government doesn't strenuously object. And, Your Honor, I think that what becomes very clear as well, to your earlier question about whether this record is clear, is that the government, at at least four points in the record, does say, We understand the court's orders, and we intend to abide by those. The government doesn't say, We don't know where this line is, or it's a little murky. And while there might have been some other confusion as to some of the court's other motion and limine orders, the mistrial arose out of the violation of the court's very clear orders as to day-in-the-life testimony and child sex trafficking issues. Well, counsel, so we've gone over a little bit, and so the weird way we're dividing up time, I want to make sure. Do either of my, any of the rest of the panel? I don't think we have any more questions for now, but I believe the other counsel is going to speak for two minutes. Is that right? Thank you. And then speak for two minutes and try to reserve the rest of the time. I please the Court, Paul Cambria, on behalf of the appellants, and we reserve five minutes for rebuttal. First of all, their motive is important here. And what's happened to this case? And we have to look at motive. When we look at the Kennedy case, one of the things they talk about is motive in footnote four. The situation is this. The prosecution said from day one the First Amendment does not apply to this case. They didn't disagree with what the rules are of the First Amendment, but it was that they said anybody could tell by looking at these ads that they were illegal, that escorts are the same as prostitutes, the only place they would be legal would be in Nevada, and that it was clear on the face of these ads that they were illegal. And immediately that turned against the government, and here's how it happened. First, the trial judge said, no, that's not true. I can see how escorts are different than prostitutes. That's the first thing. The second thing, though, was the most devastating to them. Our case, we opened saying the First Amendment says it has to be clearly and necessarily illegal on its face, the ad. And their very first witness, who is the police officer who gathered all the ads, reviewed everything, put them into evidence, he said when asked by us, can you tell simply by looking at the face of this ad that it's illegal? His answer was no. Secondly, he was asked, escorts, do you agree that escorts can be legal? He said yes. So now we're in a situation where the exact thing that they said did not apply, that the First Amendment did not apply because it was obvious in the situation with regard to escorts, he has totally decimated on them. He now lets us, the defense, be able to say to a jury if they can't figure it out, if they can't say on the face of it that it's illegal, how do you expect us to do that? That obviously is something that completely gutted their case. Now, the question – Counsel, do you want to eat into your rebuttal time or do you want to – I'd just like to finish the one thought I could get into that. The other part of this is this. The question comes up, oh, well, this is just the beginning of the case. Here's the analogy. If the defense went first and the defendant got on the stand and the defendant said, I did, I committed the crimes that were charged here, it wouldn't matter how many witnesses were called after that. The case would be over. So here we're in a situation where they say the First Amendment doesn't apply because everybody can tell on the face it's illegal, and now we have their police officer saying, I couldn't do it, I never arrested anybody based on an ad alone, it was always something more, and I know of no other police officer who's arrested someone on the face of an ad alone. Their whole theory at this point, that the First Amendment didn't apply, was decimated by him. Thank you, Counsel. Unless my colleagues have any further questions, we'll hear from the government, see if it agrees that it was trying to crash this case. May it please the Court, I'm Peter Kosinetz for the United States. We do not agree that the government was trying to sabotage the case. That is the standard that applies here, and there is no evidence of that here. The district court made two critical factual findings that were not clearly erroneous, and that support that result. First, the district court found the government didn't have a strategic reason to want to mistry the case at such an early stage, and this is essentially at ER page 10, where she says it's essentially inconceivable, highly improbable, that where the vast majority of the government's witnesses and evidence hadn't even been presented to the jury, that the government would want to sabotage the case. It doesn't sound as though the case was going very well for the government so far. Well, I think that's a misconception, Your Honor. Agent Fickner... I don't think that answer that the policeman gave was the answer you really wanted, was it? Well, the answer that he... Let me say this about Agent Fickner. He was an introductory witness. He was not qualified as an expert to testify as to whether any specific ads were for prostitution. He was there to show the jury what Backpage looked like and how ads were posted on the website. He observed many common characteristics of the escort ads, walked the jury through them. They contain a proposition. They show very explicit images. They contain highly suggestive language. Then he built an ad based on those characteristics and put it into the stream of the other escort ads and received hundreds of responses that were directed towards soliciting sex for money. So this was sort of a proof of concept of what was actually going on here, Your Honor, and which is consistent with the government's theory of the case from the beginning. It's not that the defendants and their website were publishing ads that said directly on their face, I will engage in specific sexual acts with you for specific numbers of dollars. It's that the way this website facilitated prostitution is it took ads that were very obvious and sanitized them, scrubbed them of the most suggestive, the most direct indicators of prostitution, and then published them without taking away the underlying unlawful message, without obscuring what was really going on to the buyers of commercial sex out there, but to create some distance from law enforcement, to create this veneer of deniability. So when Agent Fickner was being cross-examined and he said, yes, my undercover ad didn't have literal express language that said I will engage in these unlawful acts with you for money. The ads that I've showed you today didn't have that literal language. That was proof of concept. It really was consistent with the government's theory to begin with of how this moderation practice operated. What the jury still hadn't, and so what Agent Fickner did is he sort of paved the way for further witnesses to come forward and explain the meaning of these ads. We had Dr. Cooper, an expert who then testified and explained, well, what do these terms mean, like 100% independent? Why does that keep on appearing in these ads? In the nomenclature of prostitution, it essentially means I don't have a pimp. I'm not under the control of somebody else. Why do these ads say quick or quickie? What does that mean? And she explained that was a well-understood reference to a short-term but still illegal sexual act. And she went through other terminology as well. The victim started to explain some of the terms used in her ads, but really why we can see why the district court didn't clearly err is that the most important witnesses in the government's case hadn't yet testified. They included Carl Ferrer, who was the co-founder and eventually the CEO of Backpage, a critical insider who had worked there for 14 years. He pled guilty to conspiracy to violate the Travel Act and to commit money laundering. The factual basis of his plea agreement is at S.E.R. 15 through 17, and the government anticipated he would testify in conformance with the admissions there that Backpage's revenue, that their revenue model was based on selling prostitution ads, that they engaged in this process of moderation to scrub the ads, make them less obvious to law enforcement, and that they engaged in money laundering. Moreover, it was anticipated that he would testify as to the other affirmative prostitution marketing strategies and business practices that the defendants had overseen and executed and managed for the better part of a decade with the goal of establishing Backpage as really a leading place on the Internet to post prostitution ads and for Johns to find prostitutes to buy for commercial sex. And as part of that, there was this content aggregation process where they would go out, find prostitution ads on other websites, and then publish versions of them on Backpage directly. This is kind of first-party publication. It's not passively publishing stuff being submitted by others. This was a program that Backpage rolled out, and the person who developed that program, Dan Heyer, also pled guilty, pled guilty to count one of the superseding indictment in this case. The factual basis of his plea agreement is at SCR 115 to 117, and it was anticipated that he would testify about this program, how he knew that these ads involved prostitution because many made references to the erotic review. So there's going to be a lot of good uphill stuff for the government after this rocky start, it sounds like, is your position. What about the appellant's sort of, you know, it does sound like the government's getting sort of chastised a few times here and still continuing to have people come up and do things the district court doesn't want them to say. Why was that going on other than the government just ignoring the district court's orders? Thank you, Your Honor. I think the government endeavored as best it could to comply with the terms of the orders that were laid out before the trial and the rulings that were made during the trial, and as has been observed, the orders were not always entirely clear. But there were three main areas where the defense claims that this sort of conduct occurred. One was with the opening statement, one was with the victim witness, and the other was with the expert. With the opening statement, it's abundantly clear that there was no misconduct at all, as Judge Humetua found in her order. Before, during, and after the opening statement, the trial judge made rulings that the government could talk about child sex trafficking. That was certainly relevant to the case. Before the opening, she told the government, you can talk about trafficking, just don't make it the whole focus of your opening. During the opening, the trial court overruled most of the defense objections on that issue. After the opening, when they orally moved for a mistrial, the trial judge said, to me, the government didn't cross the line, motion denied. When there was written briefing, the trial judge came back and said, the government had complied with my pretrial order. So that's the opening statement. Then with respect to the victim witness, the prosecutor worked hard to preview for the district judge what the scope of testimony would be. So he engaged in some fairly extensive colloquies with the judge before the victim testified and really sketched out a lot of the testimony he anticipated would come out, including the fact that she had a pimp, was with him for a long time, that he posted her on Backpage, John's call to have sex with her, she did three to four tricks a night. He also said he would tell a bit of a story to kind of set the stage for her testimony as well. And the trial judge's response to all of that was basically, she can testify as to most of what you just described, and that is at ER 434 to 4350. Then again, right before she testified, there was a further colloquy, and the prosecutor said she's going to testify she was trafficked, her traffickers paid to have her posted again and again, men called to have sex with her, and she sued Backpage and was deposed and put them on notice of all of these experiences. That's at ER 443 to 445 approximately. The trial judge said she's going to be allowed to testify. If she doesn't have the foundation, she can't answer those questions, but she's going to be allowed to testify. So that kind of set the stage for what occurred later. And with respect to any specific terms or statements that came out during her testimony that the defense has talked about in their briefs, the defense didn't tie their mistrial motions to anything specifically that happened during J.S.'s testimony. They didn't say, oh, she said I was trafficked for 105 days. That was too prejudicial. We need a mistrial. They never made that argument. And as the Third Circuit noted in United States v. Curtis, when the defense counsel takes some time to try to really formulate, you know, sort of kind of assess whether a mistrial motion ought to be submitted, that indicates a lack of goading, a lack of government intent to try to trigger that sort of thing. And so there's none of that that's really tied to J.S.'s testimony. With respect to Dr. Cooper, the record is even clear, is very, very clear, Your Honors, that there was no intentional misconduct, let alone conduct intended to goad. We know she was approved three times by the trial judge to testify as an expert witness about forensic pediatrics. And the court had her 50-, 60-page CV showing her education, training, and experience in that area on page after page after page. Not only did the trial court three times approve her as an expert, but during her foundational testimony when she made most of her references to children and child sex trafficking, the defense objected. And they said, No, this is too prejudicial. It's not relevant. Stop this. The trial judge overruled their objection at ER 4725 and said, This is just foundation. She's allowed to testify about this. So we had that. And this is really the critical thing, though, that happens. Then during her substantive testimony, when she does make a reference to child protective services as being a source of information that she consults, this is when the defense moves for a mistrial. And they say, We're hearing too much about child sex trafficking. The judge says to the prosecutor, You can still talk about trafficking, but stay away from the child sex trafficking. And what's critical is what happens thereafter. The prosecutor, not wanting to violate the court's orders, certainly not wanting to get in a situation that could jeopardize the trial, takes great care to avoid those types of questions. He starts talking about adult content, adult advertising, adult entertainment, but he steers away from questions about minors by and large. He asks one question about age verification, but the court allows that over an objection. And then when the witness says something about children, knowing kind of cognizant of what happened at the sidebar, the prosecutor kind of brings the witness away to a different subject area altogether. He says, Let's start talking about the nomenclature of prostitution and trafficking, another area approved for her witness testimony. And instead of, as part of that, asking her about terms specific to children, which terms like Lolita, Amber Alert, young, high school, teen, new in town, terms that are identified throughout the superseding indictment as having been used in Backpage's ads and that appear repeatedly in Backpage's internal documents, instead of asking the expert about that, he doesn't. He conscientiously avoids doing that. That is the opposite of having any sort of intent to mistry the case. So, you know, the government did oppose the mistrial motions. They opposed them repeatedly. After they prevailed after the opening statement, during Dr. Cooper's testimony when the motions were made, again, the prosecutor grounded his arguments in the same previously successful arguments. There's no question that the government didn't want a mistrial, and there was no reason, there's been no reason proffered in the record as well. We've heard there was some discussion about escorts and kind of new revelations coming out shortly before the trial started, but that was all old news. The defense had argued from day one, even from when the case was still at the grand jury stage, that, you know, escort ads were protected, the First Amendment applied, and so forth. There's a transcript of a motion to compel discovery from Backpage that is part of the SCR. It was unsealed years ago, and it's at approximately SCR 55 through 56, 72, 100. You can see discussion of these issues and how a different district court judge essentially validated the government's theory of the case and allowed the discovery to proceed. That controversy went up to this court, and the district court was affirmed. That's set forth at 3 ER 301 to 307. We talk about a lot of that history of the litigation. And then, again, First Amendment issues were brought up in a kind of an omnibus motion to dismiss involving hundreds of pages of briefing. The trial judge really delved into those issues and issued a ruling rejecting these First Amendment arguments, and that ruling was published at 43 F sub 2nd 748. And in the ruling, she specifically pushes back against these arguments about the ads just being facially about prostitution. So as the government has alleged sufficient facts to show that people understood these ads to be for prostitution. All right, well, thank you, counsel. Do we have any other questions from my colleagues? All right, well, then we'll go ahead and hear the rebuttal. First and foremost, the best evidence that the government had no problem understanding the instructions are their own words. They said at 20 ER 4027, 20 ER 4028, and 21 ER 4354, 21 ER 4348, we understand your instructions and will tell our witnesses. The record shows, however, that every time they were given this instruction, they never asked for a chance to confer with their witness so they could embark, if you will, and give them what the instruction is. What I'd like to talk about is the decision by the motion judge here. She wasn't the trial judge, so no deference should be paid to it. But not only that, she said things in that decision that are not covered by the record. For example, she said that there was no misconduct found. Clearly the trial judge found misconduct. She granted a mistrial. She said also that the issue of how the case was going, if you will, how the proof was going, was raised and determined by the trial judge. That's not true. It was never raised. The trial judge recused herself. We were never there. And her decision, meaning the motion judge, never even talks about the Fickner testimony, the police officer testimony, and how it decimated their case. That was the motive here. And what they have, everything to gain, nothing to lose. They've heard our defense. They've taken all the money that the defendants had was confiscated by the government. Putting them through another trial would obviously be a disadvantage to the defense. When we look at what we should have had a hearing here at the very minimum, and one of the reasons is, number one, we had unsworn testimony by prosecutors saying, oh, well, we told them. But if you look at the way they testified, it appears no one told them anything because they kept doing it. And the trial judge found in her motion that they did it over and over and over. Those are her words that she used over and over again. When you do something over and over again, it's intentional. It's no longer an accident. And the motion judge said that the trial judge found no intent. That's not so. The trial judge, the statement that they refer to, the trial judge said, well, as I look at these, meaning the individual events, I'm saying there's no intent. But cumulatively, she said, when you accumulate them, that's a different thing. That obviously means that when you add them up one after another after another, it's intentional. That's not an accident. We have experienced prosecutors here. They know. They were given simple instructions. This was not a child trafficking case. All the pictures here, there's no children involved. As far as pictures and age and so on, they all are saying they're overage. The pictures, they all look like they're overage. There was no charge like that. This was a travel act case. And so what the trial judge said is, basically, you're polluting this case. And that's an old technique. I've tried lots of cases where they keep trying to inject children and inject children. It's napalm in these cases. And she told them not to do it. It was a simple thing. This is not a trafficking case for children. You can talk about vernacular. You can talk about how somebody gets posted. But that's it. No day in the life. No issues with your pimps and all the rest of it. And that's what happened. So here, at minimum, there should have been a hearing. And I want to make one point. This court in Hijiji, if I'm pronouncing it correctly, basically looked at how do we decide if there's a hearing. And you looked at the Seventh, the Second, the Fourth, and the Sixth Circuits. And there were four things you looked at. First of all, is there an explanation by the prosecutor? Here we should have had a hearing so we could have asked the witnesses, were you given any instructions here? And secondly, how is it going? In this case, or the second way was defer to the trial judge. Well, we don't have the trial judge here. It's a motion judge. It's just somebody reading the record. And so in our situation, I think that at a minimum, there should have been a hearing. We should have been able to ask those witnesses, did they give you any instructions? Because they had every motive in the world here. The case was sunk. When he said, I can't do it on the face of it, the First Amendment says, unless it's on the face, it's presumptively protected. This court in Bercy said it's presumptively protected. We're talking here about words. It's clearly a First Amendment case. Thank you. All right, counsel. Thank you very much. Thank you to both sides for your arguments. And we will submit this case as of today.
judges: FLETCHER, BYBEE, VANDYKE